UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PHILIP ANDREW HEMPEL,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF GRASS VALLEY, as operator of the Grass Valley Police Department, and OFFICER COLTON DUNCAN,<br><br>Defendants. | No. 2:21-cv-01827-MCE-JDP<br><br>**MEMORANDUM AND ORDER** |

Through the present action, Plaintiff Philip Andrew Hempel ("Plaintiff") asserts the following claims pursuant to 42 U.S.C. § 1983 against two Defendants: (1) unreasonable and excessive force causing physical injury against Defendant Colton Duncan ("Officer Duncan"); and (2) municipal liability for policy, custom, or practice causing unreasonable and excessive force against Defendant City of Grass Valley (the "City"). See First Am. Compl., ECF No. 14 ("FAC"). Presently before the Court is the City's Motion to Dismiss Plaintiff's Second Claim for municipal liability, which has been

///
///
///
///

1

fully briefed.[1]  ECF Nos. 17-1 ("City's Mot."), 21 ("Pl.'s Opp'n"), 24 ("City's Reply").  For the reasons set forth below, the City's Motion is GRANTED in part and DENIED in part.[2]

# BACKGROUND[3]

### A.     Factual Background

Plaintiff is a longtime resident of Grass Valley, California, and is familiar to the Grass Valley Police Department ("GVPD").  He suffers from post-traumatic stress disorder and associated psychological conditions and had been under a doctor's care leading up to the alleged events in question.  Plaintiff's medical care has included prescription medication.  Although not homeless at the time of the incident or since then, Plaintiff had previously experienced some periods of homelessness and on several occasions was arrested for minor offenses by GVPD.  As a result, Plaintiff was generally known by GVPD and, upon Plaintiff's information and belief, Officer Duncan.

On October 4, 2019, at approximately 11:45 p.m., Plaintiff was standing near the entrance to a Safeway store located at 867 Sutton Way, Grass Valley, California.  Plaintiff alleges he was not engaged in, or about to commit, any crime but instead was standing and walking on the sidewalk outside the store.  There had been no complaint from the Safeway store management about Plaintiff.  At the same time, Officer Duncan was on patrol in the vicinity of the Safeway store when he was allegedly informed by a local citizen that a man was outside the store, was talking out loud to himself, and appeared to have a mental health issue and/or be substance impaired.  Officer Duncan then drove his patrol vehicle to the Safeway parking lot where he observed Plaintiff

///

---

[1] Officer Duncan elected to file an Answer to Plaintiff's FAC.  ECF No. 18.

[2] Because oral argument would not have been of material assistance, the Court ordered this matter submitted on the briefs.  E.D. Local Rule 230(g).

[3] The following recitation of facts is taken, sometimes verbatim, from Plaintiff's FAC.

yelling out loud and otherwise acting in the manner of a person with a mental health issue and/or substance impairment.

As Plaintiff moved towards the entrance of the Safeway store, Officer Duncan allegedly rolled down the window of his patrol vehicle and said, "What's up man?  Go ahead and stop."  According to Plaintiff, he was not doing anything wrong and did not understand that Officer Duncan wanted him to stop.  Plaintiff then proceeded to walk into the Safeway store which had two sets of double-electric-doors, one for entering the store and the other for exiting.  There was a metal rail divider between the entrance and exit doors both inside and outside the store.  Officer Duncan exited his patrol vehicle, ran to the entrance of the Safeway store, and followed Plaintiff inside.  As Officer Duncan entered the store, Plaintiff was exiting on the other side of the divider.  Officer Duncan allegedly did not ask Plaintiff to stop or speak to him at all.  Instead, as he came around the inside divider and began to follow Plaintiff out of the store, Officer Duncan allegedly yelled, "Get on the ground."  At the same time, Plaintiff alleges that Officer Duncan grabbed him from behind and forced Plaintiff down onto the sidewalk just outside of the door.  Plaintiff states that he was thrown to the ground with such speed and force that he was not able to stop his head from hitting the concrete sidewalk, which resulted in Plaintiff's head being cut open and bleeding profusely.

Immediately after throwing Plaintiff to the ground, Officer Duncan allegedly pinned Plaintiff's left wrist and hand against the sidewalk and also placed his right hand against the back of Plaintiff's head, pushing Plaintiff's face into the pool of blood.  Officer Duncan repeatedly yelled, "Get your hands behind your back," even though Plaintiff could not comply because Officer Duncan was on top of his back and actively holding Plaintiff's left hand and head against the concrete sidewalk.  After some seconds, Officer Duncan released Plaintiff's left hand and head but when Plaintiff tried to pull his head and arms off the concrete, Officer Duncan allegedly forced him onto the concrete again and into the pooling blood.  Following several more seconds, other GVPD officers arrived on the scene and placed Plaintiff in handcuffs.  The officers questioned Plaintiff about his head

injury and summoned emergency medical assistance.  Plaintiff was transported to the local emergency room where he received treatment for his wound and bruises.

While still at the incident scene, a GVPD sergeant asked Officer Duncan (referring to Plaintiff's bloody head wound), "How did he get that?" Officer Duncan allegedly responded, "I dumped him."  At this point, Officer Duncan switched off the audio on his body camera.

### B.    The City's Policies, Practices, or Procedures

According to Plaintiff, the City is obligated to have policies, practices, and procedures ("PPPs") regarding Crisis Intervention Incidents[4] between their officers and persons having mental and/or physical health disabilities and/or substance abuse problems so that these incidents can be addressed with no force or the least amount of force possible.  Plaintiff relies on multiple GVPD policies, including two use of force PPPs ("UOF PPP"):  (1) "Factors Used to Determine the Reasonableness of Force," § 300.3.2, and (2) "Alternative Tactics – De-Escalation," § 300.3.6.  See Ex. 1, FAC, at 24–26.  In addition, Plaintiff cites five Mental Health PPPs, which are as follows: (1) Purpose, Scope, and Definitions of policy relating to "Crisis Intervention Incidents," § 464.1; (2) "First Responders," § 464.5; (3) "De-Escalation," § 464.6; (4) "Incident Orientation," § 464.7; and (5) "Supervisor Responsibilities," § 464.8.  See Ex. 2, FAC, at 32, 33–35.  The UOF and Mental Health PPPs required that GVPD employees be trained in these policies.  See UOF PPP § 300.8, Ex. 1, FAC, at 30 ("Officers, investigators, and supervisors will receive periodic training on this policy and demonstrate their knowledge and understanding . . ."); Mental Health PPP § 464.12, Ex. 2, FAC, at 36 ("In coordination with the mental health community and appropriate stakeholders, the Department will develop and provide comprehensive education and training to all department members to enable them to effectively interact with persons in

---

[4] Plaintiff defines "Crisis Intervention Incidents" as interactions between law enforcement officers and "persons with a Disability or Mental Health problem, including a substance abuse problem . . ."  FAC ¶ 29.  Such interactions, according to Plaintiff, "have greater potential for miscommunication and violence that lead to the use of force by law enforcement officers."  Id.

4

1 crisis.  This department will endeavor to provide Peace Officer Standards and Training
2 (POST)-approved advanced officer training on interaction with persons with mental
3 disabilities, welfare checks and crisis intervention . . .").

4 Plaintiff performed an analysis of the publicly available POST training records of
5 GVPD officers, which identifies the following training topics deemed relevant by Plaintiff:
6 (1) "UOF/De-Escalation," (2) "De-Esc[alation] & Tactical Comm.," (3) "Crisis
7 Int[ervention] Behavioral [H]ealth," (4) "Crisis Int[ervention] & De-Esc[alation],"
8 (5) "Hostage Neg[otiation]," (6) "Officer Involved Shootings," and (7) "Crisis Negotiation."
9 See Ex. 4, FAC, at 42.  This analysis shows that, in the ten years prior to the alleged use
10 of excessive force on Plaintiff, only 16 classes on relevant topics had been taken by
11 GVPD officers.  See id.  However, after the events in question and before the present
12 lawsuit was filed, almost all GVPD officers, including Officer Duncan, took the "UOF/De-
13 Escalation" class.  Id.  The analysis also shows that Officer Duncan did not have any
14 POST-approved training in any of the other aforementioned topics prior to his encounter
15 with Plaintiff.  Id.  Plaintiff further alleges that prior to January 1, 2020, GVPD did not
16 have a "Training Manager" and did not assign any personnel to the "Training Committee"
17 in violation of its policy.  See Ex. 3, FAC, at 38–40 (Policy 208).

18 Based on the above, Plaintiff alleges that the City failed to adequately train its
19 officers in these PPPs to prevent the use of unnecessary and excessive force used
20 against persons with mental disabilities and/or substance impairments.  Plaintiff further
21 alleges that the City did not have adequate supervision of its GVPD field officers to
22 monitor and enforce such policies.  According to Plaintiff, the alleged failure of the GVPD
23 to have a Training Manager or Training Committee shows an inadequate chain of
24 command which made it impossible to monitor, supervise, or enforce the PPPs, or to
25 adjust the actions of GVPD field officers to ensure compliance with those PPPs.  These
26 foregoing failures, Plaintiff claims, allowed the unreasonable and unnecessary use of
27 force against Plaintiff.
28 ///

5

## STANDARD

On a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), all allegations of material fact must be accepted as true and construed in the light most favorable to the nonmoving party. Cahill v. Liberty Mut. Ins. Co., 80 F.3d 336, 337–38 (9th Cir. 1996). Rule 8(a)(2) "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)). A complaint attacked by a Rule 12(b)(6) motion to dismiss does not require detailed factual allegations. However, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id. (internal citations and quotations omitted). A court is not required to accept as true a "legal conclusion couched as a factual allegation." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 555). "Factual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555 (citing 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1216 (3d ed. 2004) (stating that the pleading must contain something more than "a statement of facts that merely creates a suspicion [of] a legally cognizable right of action")).

Furthermore, "Rule 8(a)(2) . . . requires a showing, rather than a blanket assertion, of entitlement to relief." Twombly, 550 U.S. at 555 n.3 (internal citations and quotations omitted). Thus, "[w]ithout some factual allegation in the complaint, it is hard to see how a claimant could satisfy the requirement of providing not only 'fair notice' of the nature of the claim, but also 'grounds' on which the claim rests." Id. (citing Wright & Miller, supra, at 94, 95). A pleading must contain "only enough facts to state a claim to relief that is plausible on its face." Id. at 570. If the "plaintiffs . . . have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed."

Id. However, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" Id. at 556 (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)).

A court granting a motion to dismiss a complaint must then decide whether to grant leave to amend. Leave to amend should be "freely given" where there is no "undue delay, bad faith or dilatory motive on the part of the movant, . . . undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of [the] amendment . . . ." Foman v. Davis, 371 U.S. 178, 182 (1962); Eminence Capital, LLC v. Aspeon, Inc., 316 F.3d 1048, 1052 (9th Cir. 2003) (listing the Foman factors as those to be considered when deciding whether to grant leave to amend). Not all of these factors merit equal weight. Rather, "the consideration of prejudice to the opposing party . . . carries the greatest weight." Id. (citing DCD Programs, Ltd. v. Leighton, 833 F.2d 183, 185 (9th Cir. 1987)). Dismissal without leave to amend is proper only if it is clear that "the complaint could not be saved by any amendment." Intri-Plex Techs., Inc. v. Crest Group, Inc., 499 F.3d 1048, 1056 (9th Cir. 2007) (citing In re Daou Sys., Inc., 411 F.3d 1006, 1013 (9th Cir. 2005); Ascon Props., Inc. v. Mobil Oil Co., 866 F.2d 1149, 1160 (9th Cir. 1989) ("Leave need not be granted where the amendment of the complaint . . . constitutes an exercise in futility . . . .")).

## ANALYSIS

Municipalities and local officials cannot be vicariously liable for the conduct of their employees under § 1983, but rather "are responsible only for 'their own illegal acts.'" Connick v. Thompson, 563 U.S. 51, 60 (2011) (citing Monell v. N.Y. City Dep't of Soc. Servs., 436 U.S. 658, 665–83 (1978)) (emphasis in original). A local government may be liable for an injury under § 1983 under three possible theories: (1) when execution of official policies or established customs inflict a constitutional injury; (2) when omissions or failures to train amount to a local government policy of "deliberate

7

1  indifference" to constitutional rights; or (3) when a local government official with final
2  policy-making authority ratifies a subordinate's unconstitutional conduct.  See Rodriguez
3  v. Cnty. of L.A., 891 F.3d 776, 802–03 (9th Cir. 2018).

4        Here, Plaintiff's claim relies on a failure to train theory, which "may constitute a
5  basis for Monell liability where the failure amounts to deliberate indifference to the rights
6  of those who deal with municipal employees."  Benavidez v. Cnty. of San Diego,
7  993 F.3d 1134, 1153 (9th Cir. 2021).  "To allege a failure to train, a plaintiff must include
8  sufficient facts to support a reasonable inference (1) of a constitutional violation; (2) of a
9  municipal training policy that amounts to a deliberate indifference to constitutional rights;
10 and (3) that the constitutional injury would not have resulted if the municipality properly
11 trained their employees."  Id. at 1153–54.

12       In his Monell claim, Plaintiff alleges that the City failed to do the following:
13 (1) "adequately train its officers in its UOF PPPs . . . and to have its officers attend POST
14 approved training courses in use of force and de-escalation to prevent the unnecessary
15 and excessive use of force in the process of detaining and/or arresting persons"; and (2)
16 "adequately train its officers in its Mental Health PPPs . . . and to have its officers attend
17 POST approved training courses in mental health and crisis intervention to prevent the
18 unnecessary and excessive use of force in the process of detaining and/or arresting[]
19 persons with mental illness or disabilities and/or that are substance impaired."  FAC
20 ¶¶ 58–59.  Additionally, the City also allegedly "failed to adequately monitor or supervise
21 its officers to enforce the UOF PPPs, Mental Health PPPs[,] and other POST approved
22 training in mental health, de-escalation, or crisis intervention, resulting in the
23 unnecessary and excessive use of force in the process of detaining and/or arresting[]
24 persons, including persons with mental illness or disabilities and/or that are substance
25 impaired."[5]  Id. ¶ 60.

---

[5] Because Plaintiff's failure to supervise theory relies on the same allegations as the failure to train theories, the Court applies the same analysis to both.  See City's Reply, at 1–2; Davis v. City of Ellensburg, 869 F.2d 1230, 1235 (9th Cir. 1989) (finding "no principled reason to apply a different standard to inadequate supervision.").

The City seeks dismissal of this claim on grounds that it is "based solely on conclusory allegations of unconstitutional policies, customs, or practices; and three prior incidents that are too sporadic and dissimilar to support a Monell claim." City's Mot., at 2. Specifically, the City argues that "the FAC fails to allege the City had actual or constructive notice of some omission in its officers' training or supervision that causes officers to violate citizens' rights." City's Reply, at 2. However, the FAC alleges that after the incident in question, almost all GVPD officers, including Officer Duncan, were trained in "[Use of Force]/De-Escalation."[6] FAC ¶ 35; see also Ex. 4, id., at 42. Accepting Plaintiff's allegations as true and drawing all reasonable inferences in his favor for purposes of this Motion, the subsequent training of officers on use of force supports the claim that it was "known and/or obvious" to the City that such a failure to train would likely "cause serious violations of the constitutional rights of persons in the course of detention or arrest by GVPD officers . . ." Id. ¶ 63. Therefore, the City's Motion to Dismiss Plaintiff's Monell claim based on lack of training and supervision as to the UOF PPPs is DENIED.

As for Plaintiff's claim based on alleged failures to train GVPD officers on the Mental Health PPPs and supervise GVPD officers to enforce those PPPs, the Court finds that there are insufficient allegations to support this theory. Unlike the use of force training, Plaintiff's POST training analysis shows that some GVPD officers received some training in crisis intervention and behavioral health prior to the events in question but not afterwards. See Ex. 4, FAC, at 42. However, a lack of training alone is insufficient to sustain a Monell claim. See Connick, 563 U.S. at 68 ("But showing merely that additional training would have been helpful in making difficult decisions does not establish municipal liability.").

///

---

[6] Contrary to the City's argument that "Plaintiff fail[s] to identify what 'relevant topics' GVPD officers lacked training in," see City's Mot., at 6, Plaintiff's POST-training analysis identifies seven categories of classes that GVPD officers allegedly could have taken, including "[Use of Force]/De-Escalation" and "Crisis Int[ervention] & De-Esc[alation]." See Ex. 4, FAC, at 42.

Plaintiff tries to overcome this hurdle by alleging that the City "has a <u>custom or practice</u> that, although not authorized by its laws or regulations, is of 'sufficient duration, frequency and consistency' that it has 'become a traditional method of carrying out policy.'" Pl.'s Opp'n, at 4 (quoting <u>Trevino v. Gates</u>, 99 F.3d 911, 918 (9th Cir. 1996)) (emphasis in original); <u>see also</u> <u>Connick</u>, 563 U.S. at 62 ("A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train."). In support, Plaintiff alleges three "serious instances of GVPD officers using excessive force against [a] person with mental disability or substance impairment." <u>See</u> FAC ¶¶ 43–46. However, these examples are not sufficiently similar to serve as a basis for <u>Monell</u> liability here. One case involves deadly force, and another alleges that a Nevada County Sheriff's Office Deputy used excessive force against a plaintiff while a GVPD officer observed and otherwise failed to intervene or report the incident. FAC ¶¶ 44, 46; <u>see</u> <u>Thurston v. City of Vallejo</u>, No. 2:19-cv-1902-KJM-CKD, 2021 WL 1839717, at *4 (E.D. Cal. May 7, 2021) (stating that because excessive force and deadly force "each involve distinct standards and training, prior events of one category of force cannot serve as 'sufficiently similar' incidents in a matter arising from another level of force."); <u>Monteilh v. Cnty. of L.A.</u>, 820 F. Supp. 2d 1081, 1089 (C.D. Cal. 2011) ("Officers are not integral participants simply by virtue of being present at the scene of an alleged unlawful act."). Plaintiff seemingly fares better with one case alleging that a GVPD officer attacked the plaintiff, who "was a person with mental disabilities" and "seeking mental health assistance at the time of the incident," by "forcibly trying to put [the plaintiff's] surgically repaired leg through locked handcuffs even though he was not resisting." FAC ¶ 45. However, in this case, it is not alleged that Plaintiff was seeking mental health assistance; instead, the FAC alleges that Plaintiff was walking and standing near the Safeway store and that Officer Duncan was informed "that a man was outside of the Safeway and was talking out loud to himself and <u>appeared</u> to have a mental health issue and/or be substance impaired." Id. ¶¶ 9–10 (emphasis added).

Nevertheless, Plaintiff argues that a single occurrence could demonstrate a municipality's deliberate indifference "where the failure of a municipality to train presents an <u>obvious</u> risk of serious constitutional deprivation . . ." Pl.'s Opp'n, at 5 (citing <u>City of Canton, Ohio v. Harris</u>, 489 U.S. 378, 390 (1989)) (emphasis in original).  While Plaintiff is correct, that exception does not apply here.  Plaintiff contends that sending untrained officers to deal with persons suffering from mental health crises meets the deliberate indifference standard, <u>see</u> <u>id.</u> at 6, but as stated above, there are no allegations in the FAC suggesting that Plaintiff was suffering from a mental health crisis or that an untrained officer was dispatched to respond to such a crisis.  <u>Compare</u> <u>Garcia v. Yuba Cnty. Sheriff's Dep't</u>, 559 F. Supp. 3d 1122, 1125, 1130–31 (E.D. Cal. 2021) (finding the single instance exception met in case where untrained police officers were dispatched to respond to a call about someone trying to commit suicide and the city allegedly had no policy "for dealing with suspects suffering from mental health crises").  Because Plaintiff has not alleged a custom or practice to put the City on notice of a failure to train or supervise as to the Mental Health PPPs, the City's Motion to Dismiss the <u>Monell</u> claim as to this theory is GRANTED with leave to amend.

**CONCLUSION**

For the foregoing reasons, the City's Motion to Dismiss, ECF No. 17, is GRANTED in part and DENIED in part.  Plaintiff's Second Claim for municipal liability based on alleged failures to train GVPD officers on its Mental Health PPPs and supervise GVPD officers to enforce its Mental Health PPPs is DISMISSED with leave to amend.  Defendant's Motion to Dismiss is otherwise DENIED.  Not later than twenty (20) days following the date this Memorandum and Order is electronically filed, Plaintiff may, but is not required to, file an amended complaint.  If no amended complaint is timely

///

///

filed, the causes of action dismissed by virtue of this Memorandum and Order will be dismissed with prejudice upon no further notice to the parties.

IT IS SO ORDERED.

Dated:  November 4, 2022

_____
MORRISON C. ENGLAND, JR
SENIOR UNITED STATES DISTRICT JUDGE